**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jimmy Don WINKLE,**
**Defendant-Appellant.**

**No. 81–2176.**

United States Court of Appeals,
Tenth Circuit.

Dec. 5, 1983.

---

Albert R. Matthews of Bonds, Matthews, Bonds & Hayes, Muskogee, Okl., for defendant-appellant.

Donn Baker, Asst. U.S. Atty., Gary L. Richardson, U.S. Atty., and Mark F. Green, Asst. U.S. Atty., Muskogee, Okl., for plaintiff-appellee.

Before HOLLOWAY, DOYLE and SEYMOUR, Circuit Judges.

HOLLOWAY, Circuit Judge.

This is an appeal by defendant, Jimmy Don Winkle, from a conviction on two counts of knowingly and intentionally distributing controlled substances, methylphenidate (Ritalin) and oxymorphone (Numorphan), in violation of 21 U.S.C. § 841(a)(1).[1]

1. Both oxymorphone and methylphenidate are     Schedule II controlled substances today, 21

Defendant makes three arguments on appeal: (1) he was denied his Sixth Amendment right to effective assistance of counsel; (2) the Government failed to rebut his prima facie case of entrapment, entitling him to an acquittal; and (3) the trial court erred in not admitting evidence demonstrating that it was legal for the defendant to possess the controlled substances.

We will outline the factual background and then consider these contentions.

## I

### The facts

When considered in the light favorable to the Government as it must be after a conviction, the record tends to show the following facts.

The defendant owned a horse ranch and was a horse trainer. The Chief of Police of the Weleetka Police Department (Chief Lucas) had received reports that the defendant was distributing controlled substances. Apparently these substances were valuable in horse racing because they could increase a horse's performance.

Several months before defendant's arrest, Chief Lucas approached Wood Lee (Buck) Cox to solicit his aid in arranging a buy of controlled substances from the defendant. The defendant and Cox were acquaintances. The defendant had employed Cox, and they had been involved in litigation together. Mr. Cox declined to assist in the investigation because several months earlier, while training to be a police officer, he had suffered a stroke. III R. 9. Approximately two months later, Cox approached Chief Lucas and offered to assist in the investigation. At this time, although Cox was unable to work full time for the police, he did hold a Police Officer's Commission with the Weleetka Police Department. III R. 17.

An undercover narcotics buy was arranged in which Cox was to obtain controlled substances from the defendant. On June 4, 1981, Cox went to the defendant's ranch. There, Cox told the defendant that he needed controlled substances for use in a horse race. There was testimony at trial that the defendant provided Cox with some controlled and uncontrolled substances in exchange for $20.00. However, no charges were filed against the defendant as a result of this transaction.

Mr. Cox again sought to obtain controlled substances from the defendant on June 9, 1981. On this date, the Government provided Cox with $400.00 in marked bills to make a purchase. Cox obtained controlled substances, Ritalin tablets and Numorphan, from the defendant and defendant accepted the $400.00. The defendant was subsequently arrested, and charged with unlawfully distributing Schedule II controlled substances and unlawfully possessing such substances with intent to distribute.[2] 21 U.S.C. § 841(a)(1).

During the presentation of the defendant's evidence several witnesses testified that Cox had borne a grudge against the defendant because of the litigation in which the two had earlier been involved.[3] This

---

C.F.R. § 1308.12 (1982), as they were when defendant was arrested. 21 C.F.R. § 1308.12 (1981). Oxymorphone is in the opiate family, *id.* § 1308.12(b)(1), and thus is a narcotic drug. 21 U.S.C. § 802(16). Methylphenidate is a stimulant, 21 C.F.R. § 1308.12(d), and not a narcotic drug. 21 U.S.C. § 802(16). The penalties for distributing or possessing with intent to distribute are potentially greater for narcotic drugs. 21 U.S.C. § 841(b)(1).

**2.** The charges of unlawful possession with intent to distribute were dropped before trial. I R. 42. This dismissal of the possession counts occurred after defendant's motion to suppress evidence relating to those counts was sustained.

**3.** This litigation involved a dispute over the purchase of real property. The defendant sought to buy property apparently owned by Cox and another party. The defendant brought a lawsuit to specifically enforce a land sale contract. III R. 44–45. The defendant struck a bargain with Cox. Cox was to have mineral rights in the land if he supported the defendant's position in litigation to specifically enforce the land sale contract. III R. 193. Cox never did get these mineral rights and he testified at trial that he felt the defendant had not fulfilled his obligation. III R. 51–52.

earlier litigation is crucial to the principal issue of this appeal, the claim of ineffective assistance of counsel. One of defendant's attorneys, Mr. Thompson, previously represented Mr. Cox in the earlier litigation in which the defendant and Cox were involved. During the trial of the instant case, defendant's attorney Thompson cross-examined Cox and asked if Cox had ever borrowed money from defendant Winkle, which Cox denied. III R. 44. Then Thompson asked where Cox had obtained the funds to pay his attorney (Mr. Thompson) in the earlier litigation.

The prosecution objected that this was irrelevant, and the attorneys approached the bench. Out of the jury's hearing, attorney Thompson explained that he had "personal knowledge that [Cox] borrowed three hundred-fifty dollars off Mr. Winkle [the defendant] to pay me that fee." III R. 47. The court stated that defendant's attorney was "getting close to some kind of a conflict." *Id.* The prosecution argued that the defense should not be permitted to make this inquiry because Cox was entitled to know the rules of the attorney-client privilege and he probably did not. *Id.* at 48. The judge stated he did not see how the matter was important and that defendant's attorney had "better drop it," [4] and then sustained the Government's objection to the evidence. *Id.* at 48–49.

The defendant presented several witnesses who testified concerning defendant's good reputation for truth and veracity and Cox's bad reputation in that respect. Defendant then testified at length concerning his close friendship with Cox; that Cox had come to him and explained his extreme need for the substances to run his horses; that defendant tried to get Cox to use a non-controlled substance before giving him

the controlled substances; and that Cox gave him the $400 as repayment on previous loans. III R. 199–201.

After the arguments and the charge to the jury, the jury deliberated and returned verdicts of guilty on Counts I and II on which sentences were later imposed.[5] This appeal followed.

## II

### *Assistance of counsel*

Defendant's first argument on appeal is that he was denied his Sixth Amendment right to effective assistance of counsel. He says that neither of his two trial counsel conducted proper pretrial investigation to prepare the case for trial; that one of his trial counsel was incapable of participating in his trial because of his physical condition and also had expressed a willingness to let the defendant go to jail; that Mr. Thompson, the attorney who presented defendant's case at trial, had an actual conflict of interest because he had previously represented the Government's key witness (Cox), and this conflict adversely affected Mr. Thompson's performance. Appellant's Brief at 12, 15, 17, 21.

All the complaints of ineffective representation except that of a conflict of interest require only brief comment. The trial record shows vigorous presentation of the defense at trial. Mr. Thompson made the actual objections and arguments, conducted cross-examination and examined the several defense witnesses, vigorously and professionally. The trial judge asked defendant at sentencing whether he was satisfied with the attorneys' services and he asserted his dissatisfaction with their performance. He said he felt the final day was "handled very badly." III R. 276.[6]

---

4. The appendix to this opinion contains the relevant portions of the record on this point.

5. On Count one, defendant was sentenced to imprisonment for one year, and a special parole term of two years to follow any regular parole required by the parole commission. On the second count, the court suspended sentence as to imprisonment and placed defendant on three years' probation. This period was to commence on defendant's release from prison. I R. 45.

6. That day Cox was recalled to testify as the Government attempted to lay a foundation for some hearsay evidence under the co-conspirator rule. The defendant's objection was upheld and the Government lost that point. Some final Government evidence was put on, and then the defense presented eight witnesses who

The trial judge stated for the record that he felt the trial attorneys "handled themselves admirably and conducted themselves properly and submitted the evidence to the Court and the Jury as well as they could." The judge stated that defendant's attorneys did "a good job." III R. 281–82.

From our examination of the trial record we agree with this assessment by the trial judge. We note also that trial counsel for defendant prevailed on their motion to suppress substantial amounts of Government evidence, which led to the dismissal of Counts III through VII. Thus we find no merit in defendant's general complaint that his counsel were ineffective.[7]

▮▮▮▮ There remains, however, a more serious specific claim of conflict of interests. As noted, the record reveals that Mr. Thompson's prior representation of Cox created a doubt whether the defendant's representation was adequate. The Sixth Amendment entitles a defendant in a criminal case to the effective assistance of competent counsel. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *United States v. King,* 664 F.2d 1171, 1172 (10th Cir.1981). The constitutional guarantee demands that defense counsel "exercise the skill, judgment and diligence of a reasonably competent defense attorney." *Dyer v. Crisp,* 613 F.2d 275, 278 (10th Cir.) (en banc), *cert. denied,* 445 U.S. 945, 100 S.Ct. 1342, 63 L.Ed.2d 779 (1980). To establish a violation of the guarantee a defendant must show that his counsel failed to meet that standard and that the inadequacy " 'has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense.' " *United States v. Glick,* 710 F.2d 639, 644 (10th Cir.1983) (quoting *United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981)).

However, there are special considerations which apply where a defendant's counsel has a conflict of interests. In *Holloway v. Arkansas,* 435 U.S. 475, 488, 98 S.Ct. 1173, 1180, 55 L.Ed.2d 426 (1978), the Court said that it read *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), as holding that whenever a trial court improperly requires joint representation over timely objection, reversal is automatic. The Court stressed that in cases of joint representation of conflicting interests, the evil "is in what the advocate finds himself compelled to *refrain* from doing." *Holloway, supra,* 435 U.S. at 490, 98 S.Ct. at 1182 (emphasis in original).

In *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980), the Court discussed possible conflicts which inhere in almost every instance of multiple representation, concluding that the defendant who does object at trial to multiple representation must have the opportunity to show that potential conflicts impermissibly imperil his right to a fair trial. The Court held that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348, 100 S.Ct. at 1718 (footnote omitted). Further the Court there made it clear that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Id.* at 349–50, 100 S.Ct. at 1719.

---

were effectively examined by Mr. Thompson. Mr. Thompson made a forceful argument for defendant Winkle, stressing the weaknesses in the Government case, its burden of proof, and the evidence supporting the defense of entrapment. III R. 238–44.

**7.** There are affidavits attached to Appellant's Brief which detail numerous complaints about trial counsel. We do not consider these matters as they are not a part of our record. *See United States v. Carlson,* 561 F.2d 105, 109 (1st Cir.), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977); *see also United States v. Bosby,* 675 F.2d 1174, 1181 n. 9 (11th Cir.1982); *Scarborough v. Kellum,* 525 F.2d 931, 933 n. 4 (5th Cir.1976); if there is any merit to the assertions, they may be presented in a collateral proceeding and our refusal to consider them on this appeal is without prejudice to such proceedings. *Smith v. United States,* 343 F.2d 539, 541 (5th Cir.), *cert. denied,* 382 U.S. 861, 86 S.Ct. 122, 15 L.Ed.2d 99 (1965).

These principles concerning conflicts of interest are not restricted to cases of joint representation of co-defendants at a single trial. *See, e.g., Wood v. Georgia,* 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) (potential conflict between defendants' interest and the interest of their employer who paid trial counsel). The potential conflict due to what an attorney may feel he should refrain from doing, *Holloway, supra,* 435 U.S. at 490, 98 S.Ct. at 1181, is a potential problem in cases where a defendant's attorney previously represented a Government witness. We are persuaded by the views expressed in *Ross v. Heyne,* 638 F.2d 979, 983 (7th Cir.1980), that an actual conflict would arise where defense counsel is unable to cross-examine a Government witness effectively because the attorney also represented the witness. *See also United States v. Martinez,* 630 F.2d 361, 363–64 (5th Cir.1980), *cert. denied,* 450 U.S. 922, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981); *United States v. Morando,* 628 F.2d 535, 536 (9th Cir.1980).[8]

■ In sum, we conclude we should apply the conflicts principles from the cases of multiple representation of defendants here where the defense counsel in this criminal trial had represented the principal Government witness in litigation with a factual relationship to some issues in this criminal case. Therefore if the defendant can show that his attorney's previous representation of the witness adversely affected the adequacy of the defendant's representation, then defendant need not demonstrate prejudice to obtain relief. *Cuyler v. Sullivan, supra,* 446 U.S. at 349–50, 100 S.Ct. at 1718–19.

From the record before us it appears that an actual conflict of interest may have adversely affected defendant's trial counsel, Mr. Thompson. As noted, during Mr. Thompson's cross-examination of the undercover agent Cox, Cox denied ever borrowing money from defendant Winkle. III R. 44. Mr. Thompson then questioned Cox about the previous litigation in which Cox had been a party and in which Thompson had represented him.[9] Thompson sought to show that in fact Cox had borrowed $350.00 from the defendant to pay Thompson that amount as a fee. This line of testimony would appear to support the defendant's position that Cox did not pay defendant Winkle the $400.00 for the drugs, but as a repayment on loans. For whatever it was worth, this was the defendant's version of the facts. And the cross-examination questioned the credibility of Cox's denial of the loans and his testimony that the $400 was paid for the drugs.

As the Appendix shows, in a bench conference Mr. Thompson stated he had personal knowledge that Cox had borrowed $350.00 from defendant Winkle to pay Thompson his fee. The trial judge stated that Thompson was "getting close to some kind of a conflict" and expressed concern about Mr. Thompson's problem. Thompson said that Winkle would testify about the matter and that it was "not that important." III R. 48. Government counsel said the witness Cox was entitled to understand the rules about the attorney-client privilege and was not highly educated, and the judge voiced the same concern.

Mr. Thompson then stated that if the client had divulged the information to an-

---

**8.** We also find the history of *Brown v. United States,* 625 F.2d 210 (9th Cir.1979) (per curiam), relevant here. In *Brown* the court of appeals had affirmed a denial of post-conviction relief despite a claim of ineffective representation due to a conflict of interest arising from simultaneous representation of a defendant and a Government witness; the court had reasoned that there was no prejudice shown from the dual representation.

The Supreme Court vacated the judgment, 446 U.S. 962, 100 S.Ct. 2936, 64 L.Ed.2d 821 (1980), for further consideration in light of

*Cuyler v. Sullivan.* The Ninth Circuit remanded the case so that the district court could first rule on the question. 625 F.2d at 212. The trial court found that a conflict existed, but that it did not adversely affect counsel's performance because of the overwhelming evidence of guilt. In *Brown v. United States,* 665 F.2d 271, 272 (9th Cir.1982), the court of appeals again remanded, reasoning that the weight of evidence cannot of itself justify denial of relief.

**9.** *See* Appendix at p. 613 *et seq.*

other party the privilege would not apply. The Government argued that the questioning itself amounted to counsel's testifying and vouching for defendant's credibility. The trial judge stated that he did not "see how it is important, anyway, you better drop it." The judge in open court then announced that the objection was sustained. III R. 49.

We must agree that the record presents a substantial problem on the conflict question. There was an apparent difficulty confronting defense counsel when he questioned his former client's credibility, and there was an obvious difficulty about what he may have been "compelled to *refrain* from doing." *Holloway, supra* 435 U.S. at 490, 98 S.Ct. at 1182 (emphasis added). Further, counsel seems to have faced a serious question on the attorney-client privilege. The trial judge referred to Thompson's problems and then sustained the Government's objection to the line of questioning by defense counsel. The trial court did not, however, make an inquiry and a determination whether the apparent conflict was a real one adversely affecting defense counsel's performance, and whether there was a valid waiver of such a conflict by the defendant so that counsel could proceed.

■ In a case where defense counsel informed the judge as trial began that he had just observed a Government witness whom he had represented, that he would feel uncomfortable cross-examining the witness, and that this discomfort might impair his effectiveness in representing the defendant, the Fifth Circuit stated in *United States v. Martinez, supra,* 630 F.2d at 364, that

> [i]n order for a defendant effectively to waive his right to conflict-free counsel, the trial judge should affirmatively participate in the waiver decision by eliciting a statement in narrative form from the defendant indicating that he fully understands the nature of the situation and has

knowingly and intelligently made the decision to proceed with the challenged counsel. *United States v. Garcia,* 517 F.2d 272 (5th Cir.1975); *see also Gray v. Estelle,* 574 F.2d 209, 213 (5th Cir.1978); *United States v. Mahar,* 550 F.2d 1005 (5th Cir.1978).

Where the conflict of interests question is raised by defense counsel as in the *Martinez* case, or by the defendant himself, we are persuaded that the affirmative steps by the trial judge, outlined in that opinion as quoted above, are necessary. Furthermore where the trial judge knows or reasonably should know that a particular conflict exists, the court should itself initiate such an inquiry, even if defendant and his counsel do not make an objection raising the conflict question. *See Wood v. Georgia, supra,* 450 U.S. at 272, 101 S.Ct. at 1103; *Cuyler v. Sullivan, supra,* 446 U.S. at 347, 100 S.Ct. at 1717. Here the trial court discussed the conflict questions with counsel at a bench conference, and stopped the line of questioning which could have infringed on the attorney client privilege, sustaining the Government's objection to the questioning. However since this occurred at the bench conference, *see* Appendix 614,[10] there was no direct discussion with the defendant showing his awareness of the problem and whether he expressed an objection or waiver.

■ While the record thus left this serious question open without a discussion by the court with the defendant, and without a clear determination on the conflict of interests question, we cannot agree that reversal and a new trial are now mandated in the circumstances of this case. We instead are vacating the judgment and remanding so that an inquiry and determination on the question can be made by the trial court, in light of the Supreme Court's disposition in a similar situation in *Wood v. Georgia, supra,* 450 U.S. at 273–74, 101 S.Ct. at 1104–05. The district court should hold a hearing to determine whether the conflict of interests,

---

**10.** Since the critical discussion occurred at the bench, we cannot infer that the defendant was aware that his attorney was faced by a conflict of interests. *United States v. Martinez, supra,* 630 F.2d at 364.

which the record strongly suggests, actually existed and adversely affected defense counsel's performance at the time of trial.[11] If the court finds that an actual conflict did exist which adversely affected defense counsel's performance, and that there was no valid waiver of the right to counsel free of the conflict,[12] then the court should order a new trial; otherwise, the judgment should be reinstated. *See Wood v. Georgia, supra,* 450 U.S. at 273–74, 101 S.Ct. at 1104–05; *Cuyler v. Sullivan, supra,* 446 U.S. at 348–50, 100 S.Ct. at 1718–19.

## III

### *Entrapment*

■ The defendant argues that his testimony established that he was entrapped as a matter of law, and that the trial court therefore erred in denying his motion for a judgment of acquittal. Appellant's Brief at 39. Defendant reasons that he established a prima facie case of entrapment and that the burden then fell on the Government to prove beyond a reasonable doubt that he was not entrapped. *See United States v. Hill,* 626 F.2d 1301, 1303–04 (5th Cir.1980).

■ We agree that this is the proper rule on the burden of proof, but we cannot agree that the Government failed to present sufficient evidence to make entrapment a jury question here. As noted, the defendant offered substantial evidence of entrapment. However, the Government's evidence directly conflicted with portions of the defendant's testimony on entrapment. The Government could still rely on the testimony of Cox and its other evidence to meet its burden. The Government need not necessarily come forward with more evidence after the defendant has put on his

case on entrapment. We are satisfied that the evidence created a question of fact so that the issue was properly one for the jury. *See United States v. Hayes,* 477 F.2d 868, 873 (10th Cir.1973). The trial court gave an appropriate jury instruction and the jury resolved ·the question against defendant. We find no error in the denial of the motion for a judgment of acquittal.

## IV

### *Admissibility of evidence*

Defendant's final claim of error is that the trial court erred when it refused to admit evidence which would have demonstrated that defendant lawfully possessed the controlled substances in connection with his horse business. The trial court reasoned that the defendant was being tried for distributing controlled substances and that it was irrelevant whether he lawfully possessed the substances.

■ We must agree that there was an arguable basis for admission of the evidence as having relevance to the issue of the requisite intent, *i.e.* that the defendant knowingly and intentionally distributed the controlled substances. The jury might more likely believe that the defendant intended to commit the crime of unlawful distribution, and further that he was predisposed to do so, if he illegally possessed the substances. However, even assuming the admissibility of the evidence here, we feel that any error in its exclusion did not affect the substantial rights of the defendant. *See* 28 U.S.C. § 2111; Fed.R.Crim.P. 52(a). The defense was entrapment and the circumstances about it were thoroughly developed in the evidence and argued to the jury.

11. The Government contended at argument that Mr. Thompson's co-counsel, Mr. Miles, had not represented the Government witness, Cox, and that no conflict would have inhibited Miles in cross-examination of Cox. There was no mention of this in the trial record and no consideration of the practical problems of the defense in this context by the trial judge. This matter may also be considered by the district court on remand.

12. This type of waiver determination is not as desirable as a thorough on-the-record inquiry as outlined in the *Martinez* opinion, quoted above, 630 F.2d at 364, before counsel is permitted to proceed. Nevertheless the disposition in *Wood v. Georgia* illustrates that it can and should be determined, even after the fact, whether a defendant consciously chose to proceed with trial counsel, despite a known conflict to which the defendant could have objected but chose to disregard.

Hence any error in the evidentiary ruling was harmless.

## V

In sum, we find no error in the district court's ruling on entrapment as discussed in Part III. We conclude that any error in the exclusion of the proffered evidence discussed in Part IV was harmless. For the reasons explained in Part II, in light of the serious question concerning possible denial of the constitutional right to effective assistance of counsel, we vacate the judgment and remand for further proceedings in accord with this opinion.

## APPENDIX

The portions of the record which are relevant to the issue of the claim of denial of effective assistance of counsel are reproduced below. The pertinent record begins during the following cross-examination of Government witness Cox by defendant's attorney, Mr. Thompson:

### CROSS EXAMINATION
BY MR. THOMPSON:

Q  Mr. Cox, how long did you say you worked for Jimmy [Winkle]?

A  About one month.

Q  How long prior to that had you known him?

A  Oh, probably three months.

Q  Have you been friends with Mr. Winkle for the last two years?

A  Yes, sir.

Q  *Did you ever borrow any money off of Mr. Winkle?*

A  *No, sir.*

Q  Mr. Cox, you discussed or mentioned a sale of, I guess, the Pitchfork Farm to Mr. Winkle?

A  Yes, sir.

Q  And there was some litigation in that transaction, was there not?

A  Well, there was an agreement.

Q  Wasn't there a lawsuit filed to specifically enforce the contract so Mr. Winkle and Mr. Taylor could buy the property?

A  I believe there was.

Q  And you were a party to that lawsuit, weren't you?

A  Yes, sir.

Q  And who represented you?

A  I believe it was Larry Sizemore. He didn't represent me but he represented my partner.

Q  *You don't remember that I represented you?*

A  *That's right, you sure did, yeah, you represented me in the lawsuit between her and I, I believe.*

Q  *Well, sure, I represented you in that, didn't I?*

A  *Yes,. sir, you did.*

Q  *And you paid me some money, didn't you?*

A  *Yes, sir.*

Q  How much did you pay me?

MR. STIDHAM: Objection, relevancy.

MR. THOMPSON: I'm going to tie this in, Your Honor.

THE COURT: About the price?

MR. THOMPSON: Pardon?

THE COURT: About the amount of money?

MR. THOMPSON: He said he had never received a loan from Mr. Winkle.

MR. STIDHAM: The question pending was whether he had paid any money to his lawyer.

THE COURT: That's right. As to whether or not he paid you a fee, I can't see how that is relevant.

MR. THOMPSON: Well, I will tie it in, Your Honor.

THE COURT: What we are interested in is its relevance. Let's go ahead and see if you can make it relevant. Overruled.

MR. THOMPSON: I forgot my question now, Your Honor.

THE COURT: The question was if he paid you any money.

Q  I think he answered that, Judge. You paid me three hundred fifty dollars, didn't you?

A  No, two-fifty.

Q  Two hundred fifty?

A   I got five hundred out of Court and you got half of it.

Q   *Okay. Prior to that didn't you pay me a cash fee?*

A   *No, sir, I didn't.*

MR. STIDHAM: Objection, relevance, entire line.

THE COURT: Come up and tell me how it is relevant and maybe we can avoid a lot of objections.

(AT THE BENCH)

THE COURT: Now, tell me how it is relevant.

MR. THOMPSON: *Your Honor, I have personal knowledge that he borrowed three hundred-fifty dollars off of Mr. Winkle to pay me that fee. That's all I am trying to get out of this witness.*

THE COURT: *You can't testify.*

MR. THOMPSON: *Well, I know that. I am just trying to find out if he could testify to it.*

THE COURT: As to what?

MR. THOMPSON: That he paid me three hundred fifty dollars.

THE COURT: That he did what?

MR. THOMPSON: *That he paid me three hundred fifty dollars which he borrowed off of Mr. Winkle. He testified he never borrowed any money off of Mr. Winkle.*

THE COURT: *I'll tell you what, you are getting awfully close to what happened between you two, you are getting close to some kind of a conflict here about what you know and what happened as far as your transactions were with this man.*

MR. THOMPSON: Mr. Winkle was present whenever he—

THE COURT: That doesn't make any difference, I am talking about your problem. I am not talking about Mr. Winkle's problem now. *What are you going to do—you are attacking this man's credibility based on that.* What are you going to do if he says he didn't, how—

MR. THOMPSON: Mr. Winkle will testify he did. It's not that important.

THE COURT: If I was you it might be more important to you than it is to Mr. Winkle.

MR. STIDHAM: *I think this witness is also entitled to understand the rules of attorney-client privilege, also, Your Honor. I think counsel is going into an area that shouldn't be gone into, especially with a man who is obviously not highly educated and probably does not know the rules.*

THE COURT: *That is exactly what I am talking about here. You see, under attorney-client privilege he has a right to tell you a lot of things.*

MR. THOMPSON: That was the only thing I was going into, Judge, that Mr. Winkle had loaned him three hundred fifty dollars, that's the only thing I had in mind.

THE COURT: You don't recognize the problem?

MR. THOMPSON: I understand I can not divulge any of my client's confidences or secrets. If he told someone else that, or someone had been a party to it, I don't think it is an attorney-client privilege.

THE COURT: It might or might not be.

MR. STIDHAM: *But even asking him the question of whether he paid him such a sum, he is, in fact, testifying and vouching for his client's credibility that he did receive a fee, it is his testimony.*

THE COURT: *Well, I don't see how it is important, anyway, you better drop it.*

(OPEN COURT)

THE COURT: Objection sustained.

III R. 44–49 (emphasis added).